IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CITY OF PORTLAND,                                          Case No. 3:17-cv-00401-JR

              Plaintiff,                              OPINION AND ORDER

    v.

CHARLES IHEANACHO and CHERYL
D. IHEANACHO, individuals,

              Defendants.
_____

RUSSO, Magistrate Judge:

       Plaintiff City of Portland ("City") commenced this action against defendants Charles and

Cheryl Iheanacho, alleging defendants failed to report required compliance information in

conjunction with a government-administered affordable housing program loan. After settlement

negotiations collapsed, defendants filed a partial motion for summary judgment pursuant to Fed.

R. Civ. P. 56. The City also moved for summary judgment. All parties have consented to allow a

Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P.

73 and 28 U.S.C. § 636(c). For the reasons set forth below, defendants' motion is granted in part

and denied in part, the City's motion is granted in part and denied in part, and this case is dismissed.

Page 1 – OPINION AND ORDER

## BACKGROUND

The history of this matter is well known to all parties and therefore will only be recounted to the extent relevant to the present motions. The U.S. Department of Housing and Urban Development ("HUD") administers a national funding program known as the HOME Investment Partnerships Program ("HOME"), which provides funds to assist state and local governments to create affordable housing for low-income households. The Portland Development Commission ("PDC"), an agency of the City, provides funding to developers of affordable housing under terms that are significantly more favorable than those from traditional lenders and for which the developer may not otherwise qualify. In exchange, the developer accepts certain responsibilities, including renting designated units only to qualified low-income tenants and providing information, reports, and access to demonstrate compliance with program requirements.

From 1995 through 2001, defendants applied to HOME but the PDC repeatedly denied their applications. However, from 2002 through 2006, defendants entered into contracts with the PDC to finance the rehabilitation and construction of two multi-family housing developments in North/Northeast Portland: Buka's Place and Roselyn Villa ("Projects"). The foregoing contracts for each Project included, in relevant part: (1) Home Restrictive Agreement and Declaration; (2) Equity Gap Contribution Agreement; (3) Regulatory Agreement; and (4) Replacement Cost and Capital Improvement Reserve Agreement. Compl. Exs. A-H (doc. 1-1).

Defendants also obtained gap financing from other parties, including KeyBank National Association ("Key Bank") and Oregon Housing and Community Services. "To induce Key Bank to provide financing," defendants, Key Bank, and the City entered into a Subordination and Intercreditor Agreement ("Subordination Agreement") for each Property. First Iheanacho Decl. ¶¶

6, 11 (doc. 113). The Subordination Agreement for Buka's Place includes a "Notice of Default"

provision which states:

> In the event of any default under the Mortgage, the Equity Gap Agreement or any instruments related thereto (the "Subordinate Security Instruments") or the Subordinate Debt, PDC agrees to refrain from exercising any of its rights or remedies under the Subordinate Security Instruments or Subordinate Debt until (a) PDC has given written notification to [Key Bank] specifying the alleged default and the acts required to cure the same, and (b) PDC has afforded [Key Bank] a reasonable period of time, but in no event less than thirty (30) days, in which to cure such default following [Key Bank's] receipt of such notice. PDC and [defendants] agree that [Key Bank], at its option and in its discretion in each instance, may elect to cure any default under the Subordinate Security Instruments.

First Iheanacho Decl. Ex. 101, at 2 (doc. 113). The Subordination Agreement for Roselyn Villa

contains a substantively similar provision:

> In the event of any default under the Mortgage, the Equity Gap Agreement, the Home Restrictive Agreement and Declaration, the Replacement Cost and Capital Improvement Reserve Agreement, and the Regulatory Agreement, or any instruments related thereto (the "Subordinate Security Instruments") or the Subordinate Debt, PDC agrees to refrain from exercising any of its rights or remedies under the Subordinate Security Instruments or Subordinate Debt until (a) PDC has given written notification to [Key Bank] specifying the alleged default and the acts required to cure the same, and (b) PDC has afforded [Key Bank] a reasonable period of time, but in no event less than thirty (30) days, in which to cure such default following [Key Bank's] receipt of such notice. PDC and [Mr. Iheanacho][1] agree that [Key Bank], at its option and in its discretion in each instance, may elect to cure any default under the Subordinate Security Instruments.

First Iheanacho Decl. Ex. 102, at 2-3 (doc. 113).

According to defendants, portions of the plans for Buka's Place were altered without their

permission or appropriate change orders. As the budget increased, defendants ran out of money

and subcontractors placed liens on Buka's Place. As a result, defendants "were forced to take a

---

[1] Ms. Iheanacho "was not involved with the construction or developing of Roselyn Villa, is not a party to any of the Roselyn Villa Contracts, and [the City] is not asserting any claims against [her] with respect to Roselyn Villa." Defs.' Mot. Partial Summ. J. 5 n.1 (doc. 111). For brevity, however, both parties refer collectively to "defendants" in their respective motions.

home equity loan against their residence to rescue the project." Second Am. Answer ¶ 56 (doc. 110).

In 2011, the Portland Housing Bureau ("PHB") assumed PDC's rights and interests in the Projects and "changed its reporting requirements, mandating online reporting only." *Id.* at ¶ 66. Defendants allegedly "have been unable to comply with this mandate" but nonetheless "remained current with their HUD mandated reporting through the State of Oregon." *Id.*

The City filed suit in Multnomah County Circuit Court on November 10, 2016, asserting breach of contract emanating from defendants' "utter [failure to comply with] their obligations under the agreements." Compl. ¶ 11 (doc. 1-1). Specifically, the City alleges defendants have neglected to complete regulatory compliance under HOME, and submit proof of Reserve Accounts and financial data necessary to evaluate excess Cash Flow payments. On March 13, 2017, defendants timely removed the case to federal court. Defendants subsequently twice amended their Answer to assert counterclaims for breach of contract, breach of good faith and fair dealing, and civil rights violations.

In July 2021, the present summary judgment motions were filed. Briefing was completed in regard to those motions in August 2021. This case was  initially assigned to U.S. Magistrate Judge Acosta, and then in March 2022 reassigned to U.S. Magistrate Judge Armistead and, eventually, reassigned again to U.S. Magistrate Judge You. Judge You held oral argument on May 10, 2022. On May 13, 2022, the case was once again reassigned from Judge You to this Court.

**STANDARD OF REVIEW**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

The parties cross-move for summary judgment as to the City's breach of contract claim. In addition, the City seeks summary judgment on defendants' counterclaims because they are time-barred and/or fail in light of the evidentiary record.

## I.    Cross-Motions for Summary Judgment

Defendants asserts that summary judgment is warranted in regard to the City's breach of contract claim because the Subordination Agreements' "Notice of Default" provisions are unambiguous, and the City neglected to fulfill their requirements. In particular, defendants argue that the City "is barred from recovering . . . because it failed to serve Key Bank with at least a 30-day notice of default – a condition precedent to [the City's] right to file suit." Defs.' Mot. Partial

Summ. J. 5 (doc. 111). Defendants also contend they are entitled to contractual attorney fees under Or. Rev. Stat. § 20.077.

The City does not dispute its failure to satisfy the "Notice of Default" provisions. Rather, the City argues that no breach occurred because "as a whole [the Subordination Agreements] do not require the City to provide notice to Key Bank for regulatory noncompliance under the HOME program." Pl.'s Resp. to Mot. Partial Summ. J. 1 (doc. 119). Essentially, the City maintains that notice was not necessary because the "purpose of the Subordination Agreements is to protect Key Bank's financial interest in Buka's Place and Roselyn Villa," and none of defendants' purported breaches directly relate to their repayment obligations. Id. at 2-4. Alternatively, the City contends: (1) the Subordination Agreements are ambiguous and extrinsic evidence "resolves any ambiguity regarding the applicability of the notice provision in favor of the City"; (2) defendants "waived the notice provisions of the Subordination Agreements"; and (3) it is undisputed defendants have long been in "breach [of] the Cash Flow Payment, Reserve Account, and Reporting Requirements of the Loan Agreements."[2] Id. at 1; Pl.'s Mot. Summ. J. 11-15 (doc. 116).

---

[2] The City also asserts the "Subpoena Duces Tecum issued to Key Bank on March 8, 2021[,] cures the alleged notice deficiency," or that defendants' motion should be stayed "to allow the City to provide notice to Key Bank under the Subordination Agreements." Pl.'s Resp. to Mot. Partial Summ. J. 1, 11-12 (doc. 119). Further, the City maintained, for the first time at oral argument, that the Buka's Place Regulatory Agreement "has an express reservation of the subordination" such that it should at least be allowed to proceed with its allegations related thereto. Hearing 12-13 (May 10, 2022) (doc. 134). Beyond raising the issue of a stay and Subpoena Duces Tecum in a brief and conclusory fashion at the beginning and end of their response, the City does not provide any argument or evidence to support either request. In any event, allegations of notice compliance are not contained in the City's complaint and no motion to stay had been filed. See LR 7-1(b) ("[m]otions may not be combined with any response, reply, or other pleading"); see also Wasco Prods., Inc., v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006) (summary judgment "is not a procedural second chance to flesh out inadequate pleadings") (citation and internal quotations omitted). And the Subpoena Duces Tecum is silent as to defendants' purported breaches. The City's final argument concerning the Buka's Place Regulatory Agreement has not been sufficiently raised or developed. Nevertheless, because the Subordination Agreement expressly references all underlying instruments between the City and defendants, it would likely serve as a modification

A.      Interpreting the Subordination Agreements

In interpreting a contract under Oregon law, the court employs a three-step analysis. *Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997) (citations omitted). First, the court determines whether the provision at issue is ambiguous. *Batzer Const., Inc. v. Boyer*, 204 Or.App. 309, 315, 129 P.3d 773, *rev. denied,* 341 Or. 366, 143 P.3d 239 (2006) (citations omitted). A contractual term is ambiguous "if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation." *Id.* at 313 (citation and internal quotations omitted). For potentially ambiguous or flexible terms, the court considers the text and context, as well as the circumstances surrounding the contract's creation, including "the parties' precontract negotiations." *Id.* at 316-20 (citations omitted); *see also State v. Heisser*, 350 Or. 12, 25, 249 P.3d 113 (2011) ("[w]hen considering a written contractual provision, the court's first inquiry is what the words of the contract say, not what the parties say about it") (citation and internal quotations omitted). "The court must, if possible, construe the contract so as to give effect to all of its provisions." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379, 271 P.3d 103 (2011).

Second, the court evaluates extrinsic evidence of the contracting parties' intent if the text, context, and circumstances of formation evince ambiguity. *Batzer*, 204 Or.App. at 316-17 (citations omitted). If the "provision remains ambiguous after the first two steps have been

---

to the Regulatory Agreement. *See Mail-Well Envelope Co. v. Saley*, 262 Or. 143, 151-52, 497 P.2d 364 (1972) ("[t]he parties to a contract may subsequently modify a previous contract by changing or adding to its terms without superseding the old contract or destroying its obligations, except insofar as the new terms are inconsistent with the terms of the old contract"). Indeed, the Buka's Place Regulatory Agreement states only that it is "not subordinate to the permanent loan and loan documents on the Project," subject to certain exceptions not relevant here, and explicitly contemplates that the "[t]he PDC may subordinate this Agreement to other financing." Compl. Ex. D, at 8 (doc. 1-1).

followed, the court relies on appropriate maxims of construction" to determine the provision's meaning. *Yogman*, 325 Or. at 364.

The Court finds the "Notice of Default" provisions unambiguous. Indeed, under Buka's Place's Subordination Agreement, the City was required to serve Key Bank with notice "[i]n the event of ***any default under the Mortgage, the Equity Gap Agreement or any instruments related thereto*** (the 'Subordinate Security Instruments') or the Subordinate Debt" prior to "exercising any of its rights or remedies under the Subordination Security Instruments or Subordinate Debt." First Iheanacho Decl. Ex. 101, at 2 (doc. 113) (emphasis added). Similarly, Roselyn Villa's Subordination Agreement required the City to serve Key Bank with notice "[i]n the event of ***any default under the Mortgage, the Equity Gap Agreement, the Home Restrictive Agreement and Declaration, the Replacement Cost and Capital Improvement Reserve Agreement, and the Regulatory Agreement, or any instruments related thereto*** (the 'Subordinate Security Instruments') or the Subordinate Debt" prior to "exercising any of its rights or remedies under the Subordination Security Instruments or Subordinate Debt." First Iheanacho Decl. Ex. 102, at 2-3 (doc. 113) (emphasis added).

Moreover, neither "Notice of Default" provision is enforceable exclusively by Key Bank. The plain language states that the Subordination Agreements "shall be binding and inure to the benefits of the parties hereto" – i.e., the City, defendants, and Key Bank. First Iheanacho Decl. Ex. 101, at 3 (doc. 113); First Iheanacho Decl. Ex. 102, at 4 (doc. 113).

Stated differently, the Subordination Agreements clearly obligated the City to serve Key Bank with at least a 30-day notice of default before it had the right to file suit against defendants, irrespective of whether the default originated from the underlying debt or regulatory noncompliance with the City and defendants' other agreements. And, contrary to the City's

assertion, no other provision alters or amends that requirement. Specifically, the "Subordination" clauses' references to "indebtedness" merely establish the subservience of the City's interests in the Projects to Key Bank – it otherwise has no bearing on the "Notice of Default" provisions.[3] Accepting the City's argument would render express language within the Subordination Agreements meaningless – namely, that which distinguishes between the "Subordinate Debt" (contractually defined as "indebtedness secured by the Mortgage") and the "Subordinate Security Instruments" (contractually defined as the Equity Gap Agreement "or any instruments related thereto"). First Iheanacho Decl. Ex. 101, at 1-2 (doc. 113); First Iheanacho Decl. Ex. 102, at 1-3 (doc. 113).

In sum, no word or phrase in the "Notice of Default" provisions are inherently flexible or open to more than one reasonable interpretation. As such, the Court need not reach the City's alternate argument concerning ambiguities in the Subordination Agreement and extrinsic evidence. *See Heisser*, 350 Or. at 25 (courts "first examine the text of the disputed provision . . . [if] clear, the analysis ends") (citation and internal quotations and brackets omitted); *see also Van Atta v. Stephanie Fry, Inc.*, 295 Or.App. 465, 473, 434 P.3d 975 (2018) (extrinsic evidence "may only affect interpretation when there is language in the instrument that is susceptible to being construed to carry out the proposed intent") (citation and internal quotations omitted). Regardless, the City's extrinsic evidence does not alter the outcome, as defendants' pleadings regarding the City's alleged improper efforts to induce Key Bank to foreclose do not have any bearing on the Subordination Agreements' requirements.

---

[3] The City nonetheless concedes that one of defendants' purported breaches – i.e., the failure to provide tenant income data which is used to "determine what, if any, Excess Cash Flow payments are due to the City" – could result in indebtedness. Pl.'s Resp. to Mot. Partial Summ. J. 8 (doc. 119); *see also* First Woodward Decl. Ex. 9 (doc. 117-1) (2016 correspondence in which the City requested $7,566 in unpaid Cash Flow Payments accrued between 2008 and 2014).

### B.    Waiver/Estoppel

Waiver refers to "the intentional relinquishment of a known right, claim or privilege," whereas "[e]stoppel is an equitable principle that precludes someone from exercising a right to another's detriment if the right holder, through words or conduct, has led the other to believe that the right would not be exercised." *Daly v. Fitch*, 70 Or.App. 18, 21 n.2, 687 P.2d 1124 (1984).

Nothing in the record here reflects that defendants clearly and unequivocally manifested an intent to forgo the requirements of the "Notice of Default" provisions. *See Anderson v. Divito*, 138 Or.App. 272, 282, 908 P.2d 315 (1995) (articulating the standard for waiver); *see also Brooks v. Caswell*, 2015 WL 5178080, *7 (D. Or. Sept. 3, 2015) (rejecting the plaintiff's argument that the defendants "waived their mediation defense by engaging in extensive litigation before asserting the defense in the Second Amended Answer"). Whether defendants should be estopped from raising the Subordination Agreements as the sole basis for dismissal of the City's claim poses a closer question, but only marginally.

The City characterizes defendants as sitting on their rights for "4 years," such that dismissal "at this stage of litigation would create further financial burden for City taxpayers; would further delay the City's efforts to bring Defendants into regulatory compliance; and would further jeopardize affordable housing in the City." Pl.'s Resp. to Mot. Partial Summ. J. 10 (doc. 119). Yet an independent review of the record reveals that the parties were diligently and, seemingly successfully, pursuing settlement since at least September 2018. At that time, neither party had taken any depositions and discovery was incomplete. Settlement negotiations fell apart at the eleventh hour and case deadlines were reinstated in August 2020, at which point discovery resumed and defendants obtained new counsel. *Cf.* Hearing 13 (May 10, 2022) (doc. 134) (the City's counsel recognizing at oral argument that "for two years the parties met semi-regularly and

with the assistance of Judge Papak in order to craft this settlement agreement that ultimately the defendants chose not to proceed with"). Defendants then twice sought, and were granted, extensions of time to allow new counsel to procure the client file and pursue additional discovery. The parties filed their respective summary judgment motions shortly thereafter.

Defendants would have had no legal or factual basis to raise the "Notice of Default" provisions until settlement efforts were abandoned, new counsel was obtained, and discovery was complete. *See, e.g.*, Second Woodward Decl. Ex. 15, at 1 (doc. 119). In fact, when defendants filed their Answer, they reserved the right to "rely upon any additional defenses that become available or apparent during discovery, and reserve their right to amend this pleading and assert such additional defenses . . . as discovery proceeds." Answer ¶ 39 (doc. 6). After defendants' new counsel became apprised of the City's failure to satisfy conditions precedent during the discovery period, defendants amended their Answer to include the foregoing defense (an amendment to which the City did not object). Second Am. Answer ¶ 36 (doc. 110).

Because it is undisputed the City did not give Key Bank written notice of defendants' purported defaults prior to filing suit, the merits of their claim are immaterial at this juncture, as are the parties' arguments surrounding the propriety of defendants' affirmative defenses.[4] First Mentzer Decl. Ex. 103, at 2, 6-7 (doc. 112); *see also Vision Realty, Inc. v. Kohler*, 214 Or.App.

---

[4] In so finding, the Court appreciates the City's frustration with the length of these proceedings and lack of substantive resolution. *See* Hearing 8 (May 10, 2022) (doc. 134) ("it seems difficult to support the position that after 20 years of noncompliance with contractual terms, the defendants would be allowed to dismiss this case" due to a technicality regarding notice); *see also id.* at 13-14 ("[the City] has come very far, and the whole purpose of this litigation has always just been to get the regulatory compliance on these properties in a form that would pass any audit that the City may undergo from its federal and state funding partners"). Yet, as addressed herein and at oral argument, the Subordination Agreements clearly and unambiguously impose a duty to provide Key Bank with written notice of default as a prerequisite to filing suit, and case law dictates that dismissal without prejudice is the appropriate remedy under these circumstances.

220, 226, 164 P.3d 330 (2007) ("[a] condition precedent is one that must be performed before liability arises") (citation and internal quotations omitted); *Stone & Webster, Inc. v. Ga. Power Co.*, 968 F.Supp.2d 1, 11 (D. D.C. 2013) (appropriate remedy for the plaintiff's failure to satisfy condition precedent of mediation was dismissal without prejudice where the claims were not time-barred, even though the parties engaged in mediation during the pendency of the litigation). Therefore, defendants' motion is granted, and the City's motion is denied, as to the City's breach of contract claim.

### C.    Attorney Fees

Section 20.077 applies to "any action or suit" where "one or more claims are asserted for which . . . attorney fees are authorized" under either statute or contract. Or. Rev. Stat. § 20.077(1). When a civil action involves multiple claims for which attorney fees are available, the court must "determine the prevailing party on each claim and award attorney fees accordingly." *Robert Camel Contracting v. Krautscheid*, 205 Or.App. 498, 503, 134 P.3d 1065 (2006).

The City does not dispute that attorney fees are authorized by a number of the agreements it is attempting to enforce via these proceedings, along with the Subordination Agreements themselves. *See generally* Compl. Exs. B, D, F, E, G (doc. 1-1); First Iheanacho Decl. Exs. 101-02 (doc. 113). Rather, the City maintains that, should defendants be deemed the prevailing party, they "are entitled only to fees related to the Subordination Agreements" because their motion "is based on a single theory," such that any fees "incurred in the litigation prior to February 25, 2021 – including pursuit of their own counter claims – are wholly unrelated." Pl.'s Resp. to Mot. Partial Summ. J. 12 (doc. 119).

As both parties acknowledged at oral argument before Judge You, nothing prevents the City from complying with the Subordination Agreements' "Notice of Default" provisions at a later

date. Hearing 5-7, 19 (May 10, 2022) (doc. 134). Indeed, defendants concede dismissal would be without prejudice, as "there's no statute of limitations that would prevent [the City] from bringing this claim again if they so desired." *Id.* at 11. Thus, as Judge You stated, there is an open question concerning whether "defendants have prevailed" since the substantive merits of the City's claim remain outstanding but, as discussed in greater detail below, defendants do not meaningfully dispute materially breaching the parties' loan agreements. *Id.* at 18. Significantly, defendants' counsel recognized that the issue of fees "would require further briefing . . . because this would ultimately be a matter of state law with respect to what would constitute [a] prevailing party in this particular situation with such a dismissal." *Id.* Accordingly, given the procedural posture of this case, coupled with the parties' admissions at oral argument, the Court is not currently in a position to determine the propriety of attorney fees.

The Court nonetheless denotes that, pursuant to Or. Rev. Stat. § 20.077, the prevailing party is entitled to any fees incurred defending against the underlying claim, which, in this case, does not allege breaches of the Subordination Agreements but rather of the Home Restrictive Agreement and Declaration, Equity Gap Contribution Agreement, Regulatory Agreement, and Replacement Cost and Capital Improvement Reserve Agreement. *See id.* at 17 (defendants' counsel at oral argument clarifying that their request for attorney fees is "with respect to their defense against the City's claim [and] not an award [as to] their counterclaims"); *see also Mindful Insights, LLC v. VerifyValid, LLC*, 301 Or.App. 256, 267-69, 454 P.3d 787 (2019) (discussing the interplay between Or. Rev. Stat. § 20.077, Or. Rev. Stat. § 20.083, and Or. Rev. Stat. § 20.096).

## II.    Motion for Summary Judgment as to Counterclaims

The City asserts that defendants' breach of contract and civil rights claims are barred by the applicable statutes of limitations and unsupported by evidence. Additionally, the City contends that "defendants cannot bring a breach of contract action where they have failed to perform on the contract." Pl.'s Mot. Summ. J. 22 (doc. 116). According to the City, defendants' final claim for breach of good faith and fair dealing fails because "[n]o evidence suggests the City engaged in improper behavior in the performance and enforcement of contracts or any acts that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* at 24 (internal quotations omitted).

Defendants' opposition is silent as to their breach of contract claim and certain aspects of their breach of good faith and fair dealing claim, instead focusing predominately on their affirmative defenses to the City's breach of contract claim and the merits of their civil rights claims.

### A.    Breach of Contract

Defendants allege the City breached the parties' underlying contracts by failing to: regularly inspect the Projects and set aside property taxes, "remit a Statement of Project Cost Savings which prevented Defendants from calculating any Equity Gap Amounts due to Plaintiff (if any) and which prevented Defendants from calculating any developer's fees due to itself," provide "information on updated HOME rent limits pursuant to Section 3.5 of the Home Restrictive Agreement so that rents could be adjusted," "conduct the requisite environmental inspections pursuant to 24 C.F.R. § 92.352," and furnish documentation and requisite training to ensure their compliance with all HUD requirements. Second Am. Answer ¶¶ 67-73 (doc. 110).

### i.    Statute of Limitations

Under Oregon law, contract actions must be commenced within six-years. Or. Rev. Stat. § 12.080(1). No "discovery rule" applies to contract claims in Oregon, except in cases of fraudulent concealment. *Waxman v. Waxman & Assocs., Inc.*, 224 Or.App. 499, 512, 198 P.3d 445 (2008). In other words, the applicable statute of limitations runs "from the date of breach." *Id.* "[I]f independent acts cause independent injuries, each act is separately actionable, and the statute of limitations begins to run separately with each alleged breach." *Pritchard v. Regence Bluecross Blueshield of Or.*, 225 Or.App. 455, 460, 201 P.3d 290, *rev. denied*, 346 Or. 184, 201 P.3d 290 (2009).

The Projects were issued final permits and certificates of occupancy on or before January 29, 2007. First Woodward Decl. Exs. 10-11 (doc. 117-1). Even allowing for a full year to finalize project costs, the City's purported breaches related to construction costs and resultant personal loans, payment of developer fees, inspection requirements, tax abatements, and failure to remit Statement of Project Cost Savings accrued no later than January 2008 – more than eight years before the filing of this action.

Defendants do not separately address or otherwise oppose the City's arguments concerning their breach of contract claim. *See Justice v. Rockwell Collins. Inc.*, 117 F.Supp.3d 1119, 1134 (D. Or. 2015), *aff'd*, 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded") (citation and internal quotations and brackets omitted). In fact, defendants' sole mention of the relevant statute of limitations occurs in regard to their discussion of their own affirmative defenses. *See* Defs.' Resp. to Mot. Summ. J. 6 (doc. 121) ("[the City] waited an unreasonable length of time – approximate[ly] 12 to 14 years – before filing suit, more than twice the length of time of the Statute

of Limitations for breach of contract claims applicable to private parties," citing Or. Rev. Stat. § 12.080).[5] Accordingly, the City's motion is granted in this regard.

### ii.      Defendants' Own Material Breaches

It is well-established that the party seeking to recover under the terms of an express contract must prove his or her own substantial performance (or a valid excuse for the failure to perform) in order to recover. *Lamb-Weston, Inc. v. Or. Auto Ins. Co.*, 219 Or. 110, 116, 341 P.2d 110 (1959). That is, a material breach or nonperformance of a promise by one party to a bilateral contract may discharge the other party's contractual duty. *Wasserburger v. Am. Sci. Chem, Inc.*, 267 Or. 77, 82, 514 P.2d 1097 (1973). "A breach is material if it goes to the very substance of the contract and defeats the object of the parties in entering into the contract." *Bisio v. Madenwald*, 33 Or.App. 325, 331, 576 P.2d 801 (1978); *see also Venture Props. v. Parker*, 223 Or.App. 321, 353-54, 195 P.3d 470 (2008) (defining criteria used to assess materiality).

As noted above, defendants present no argument or evidence to establish their regulatory compliance or satisfactory performance under the loan agreements. At most, defendants imply that some of the purported defaults were not sufficiently noticed (thereby depriving them of the chance to cure) or excused due to impossibility. *See, e.g.*, Defs.' Resp. to Mot. Summ. J. 9-11 (doc. 121).

Initially, defendants' inability to successfully navigate the City's online reporting system cannot be characterized as a significant enough barrier to compliance to excuse their

---

[5] As Judge Acosta previously determined, the fact that the City, as a public entity, is not compelled to initiate its claim within the six-year limitations period does not preclude the City from raising Or. Rev. Stat. § 12.080 as an affirmative defense. Opinion & Order 12-13 (Mar. 22, 2018) (doc. 45) (citing Or. Rev. Stat. § 12.250).

nonperformance,[6] especially given evidence of the City's attempts to meet and/or correspond with defendants on numerous occasions in an effort to ameliorate these issues. First Woodward Decl. Exs. 2-5, 9 (doc. 117-1); *see also Sachs v. Precision Prods. Co.*, 257 Or. 273, 281, 476 P.2d 199 (1970) ("unexpected difficulties and expense do not excuse performance of a contract unless so extreme that a practical impossibility exists and resulting in a hardship so extreme as to be outside any reasonable contemplation of the parties"); Defs.' Reply to Mot. Summ. J. 6 (doc. 125) ("[t]he City has no contractual obligation to provide Defendants an alternate method for document submission and the City never waived this requirement").

More importantly, defendants' failure to counter the City's detailed assertions regarding their myriad breaches is fatal to their counterclaim at this stage in the proceedings. *See Celotex*, 477 U.S. at 322 (summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden on proof at trial"); *see also Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1116 (9th Cir. 2003) ("conclusory allegations, unsupported by facts, are insufficient to survive a motion for summary judgment"). The City is entitled to summary judgment on defendants' breach of contract claim for this additional reason.

### B.    Breach of Good Faith and Fair Dealing

Defendants contend the City breached the covenant of good faith and fair dealing by: "[f]ailing to remit any project documents, including budgets, accountings and expenditures from the Buka's Place project in 2013 in return for conducting an inspection of Buka's Place and Roselyn Villa"; "[c]hanging the number of designated 'HOME' units from three (3) to five (5)

---

[6] Defendants' evidence relating to their lack of online reporting merely reflects that Mr. Iheanacho contacted PHB "numerous times for assistance" and, on one occasion in 2013, was given a faulty web address. Second Iheanacho Decl. ¶ 7 & Ex. 102 (doc. 122).

units and failing to advise Defendants that rents could be raised"; "[c]ontacting the Senior Lender

Key Bank to attempt to manipulate a foreclosure upon" the Projects; "[f]ailing to assist Defendant

in meeting reporting requirements by another means other than the computer system which

Defendants cannot access or use"; threatening "foreclosure because Defendants were unable to use

the automated computer reporting system"; "[r]epeatedly attempting to induce Defendants into a

breach of the underlying Loan agreements" so that the City could retake the Projects; and

"[i]mposing real estate taxes upon both projects without notice." Second Am. Answer ¶¶ 74-80

(doc. 110).

 In Oregon, "[t]he law imposes a duty of good faith and fair dealing in the performance and

enforcement of every contract." *Hampton Tree Farms, Inc. v. Jewett*, 320 Or. 599, 615, 892 P.2d

683 (1995) (citations omitted). The purpose of this duty "is to prohibit improper behavior [and]

ensure that the parties will refrain from any act that would have the effect of destroying or injuring

the right of the other party to receive the fruits of the contract." *Klamath Off-Project Water Users,

Inc. v. Pacificorp*, 237 Or.App. 434, 445, 240 P.3d 94 (2010) (citation and internal quotations

omitted).

 The good faith doctrine is therefore designed to effectuate the objectively reasonable

contractual expectations of the parties. *Tolbert v. First Nat'l Bank of Or.*, 312 Or. 485, 494, 823

P.2d 965 (1991). This duty, however, "may be implied as to a disputed issue only if the parties

have not agreed to an express term that governs that issue." *Or. Univ. Sys. v. Or. Pub. Emps. Union,

Local 503*, 185 Or.App. 506, 511, 60 P.3d 567 (2002); *see also U.S. Nat'l Bank of Or. v. Boge*,

311 Or. 550, 567, 814 P.2d 1082 (1991) (the "obligation of good faith does not vary the substantive

terms of the bargain"). Accordingly, to prevail on a breach of good faith and fair dealing claim,

the plaintiff must introduce facts indicative of conduct that goes beyond that which is reasonably

contemplated by the parties' contract – e.g., intentional misconduct, improper behavior, etc. *See, e.g.*, *Best v. U.S. Nat'l Bank of Or.*, 303 Or. 557, 563, 739 P.2d 554 (1987).

Defendants, via their opposition, once again do not respond to the arguments raised by the City in moving for summary judgment. That is, defendants do not dispute the City's assertion that "no evidence exists to support Defendants' allegations" regarding Key Bank, property taxes, changes to the number of designated HOME units, or, more generally, the City's improper behavior. Pl.'s Mot. Summ. J. 23-24 (doc. 116). Instead, defendants simply conclude that genuine issues of material fact exist solely as to their first allegation – i.e., the City breached a promise "PHB staff Javier Mena and Kathy Peoples and Deputy City Attorney Franco Lucchin [made in September 2014 to] remit all budgets, expenditures, and accountings related to the construction of Buka's Place" after defendants authorized an on-site inspection. Defs.' Resp. to Mot. Summ. J. 12 (doc. 121); Second Iheanacho Decl. ¶¶ 9-11 (doc. 122).

Defendants thus have not set forth any argument or evidence demonstrating the breach of any objectively reasonable contractual expectation, or the impairment to their right to receive the fruits of their agreements. Indeed, the duty of good faith and fair dealing operates to effectuate the reasonable expectations of the parties as determined by the terms of their contract and, here, those terms demonstrate that the parties agreed to certain regulatory requirements that have not been met. Yet defendants continue to own and operate Buka's Place and Roselyn Villa.

And defendants do not sincerely assert that the September 2014 meeting altered those express contractual requirements or otherwise excused their nonperformance. *See* Second Iheanacho Decl. ¶ 12 (doc. 122) (Mr. Iheanacho stating that he believed the "compliance issues had been resolved" simply because "more than 60 days had elapsed from the date of Deputy City Attorney Lucchin's letter with no change in circumstance (but-for the properly inspections)"); *see*

Page 19 – OPINION AND ORDER

*also* First Woodward Decl. Ex. 8 (doc. 117-1) (October 2014 email from defendants' former counsel accusing the City of failing to take actions "to move this situation forward [and] again making demands"); Third Woodward Decl. Ex. 20 (doc. 126-1) (the City's October 2014 responding email, stating that "the meeting we had at your office, after quite some time trying to elicit a response from you, was to try and get your client to comply with his contractual obligations, not to 'appease' a breaching party"). While there are a dearth of facts in the record surrounding the September 2014 meeting, the evidence that does exist does not intimate any attempt by the City to evade the spirit of the bargain or interfere with defendants' performance. The City's motion is granted as to defendants' breach of good faith and fair dealing claim.

### C.    Racial Discrimination

In regard to their last subset of claims, defendants assert the City violated 42 U.S.C. §§ 1981, 1983, and 2000(d) based on the previously alleged acts, as well as by: denying "access to the HOME program for six (6) years"; knowing Buka's Place was underfunded and refusing "to extend a zero percent loan . . . when the original funding" was depleted, or taking any other steps to prevent the Project's "imminent financial failure"; making "disbursements to contractors without enforcing the change order clause in the contract"; "actively engag[ing] in actions designed to gentrify the North and Northeast Killingsworth corridor"; failing to "rectify problems or assist Defendants with problems regarding computer intake and reporting system," or "create reports to clear Defendants from non-compliance after conducting inspections and reviewing documents requested by [the City]"; instituting "this action in furtherance of PHB Director Javier Mena's threat to foreclose on [the Projects] because Defendant was not using the computer reporting system"; and "[e]ngaging in a pattern of threats and intimidation against Charles Iheanacho." Second Am. Answer ¶¶ 81-95 (doc. 110).

Claims under 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 2000d are subject to a

two year statute of limitations in Oregon. *See Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir.

2004) (citing Or. Rev. Stat. § 12.110); *see also Taylor v. Regents of the Univ. of Cal.*, 993 F.2d

710, 712 (9th Cir. 1993) (Title VI claims are governed by the same state limitations period as §

1983 claims). The limitations period begins to accrue when the plaintiff has "a complete and

present cause of action," which means the "plaintiff can file suit and obtain relief." *Wallace v.

Kato*, 549 U.S. 384, 388 (2007). A claim is "discovered" under federal law "when the plaintiff

knows or has reason to know of the injury which is the basis of the action." *TwoRivers v. Lewis*,

174 F.3d 987, 991-92 (9th Cir. 1999).

The record in this case demonstrates that, in August 2013, Mr. Iheanacho specifically

alleged impermissible conduct that gives rise to his civil rights claims. In an email exchange with

PHB employees Javier Mena and Kathy Peoples, Mr. Iheanacho wrote, in relevant apart: "With

your threats of foreclosure, [I] think we are heading to court to get these issues sorted out." Third

Woodward Decl. Ex. 23 (doc. 126-1). Defendants thereafter obtained counsel who then, in October

2014, identified disparate treatment in an email to the City, stating: "I would welcome a HUD

audit to ascertain if this is the demeanor PDC/PHB takes with all property owners or if this conduct

is reserved for specific peoples in specific areas of this city." First Woodward Decl. Ex. 8 (doc.

117-1).

Despite their assertions to the contrary, these emails demonstrate that defendants knew of

the facts underlying their discrimination claims, and their ability to seek judicial relief, more than

two years before this case was filed.[7] In fact, defendants' allegations largely inhere to events that

---

[7] To the extent defendants' opposition can be read as asserting the relevant "challenged decision"
is the City's filing of this litigation, such allegations do not appear in their Second Amended
Answer and, as such, are not currently before the Court. Defs.' Resp. to Mot. Summ. J. 16 (doc.

defendants knew or should have known were wrongful the moment they occurred. For instance, defendants were aware of the City's prior and repeated HOME denials no later than 2001. Similarly, they perceived problems with online reporting shortly after PHB changed systems in 2011. Defendants likewise were cognizant of the construction issues and underfunding surrounding Buka's Place by the time it was completed in 2006, even if the full extent of the injury was not yet apparent. *See Weems v. Or. Univ. Sys.*, 2012 WL 4093539, *6 (D. Or. Sept. 17, 2012), *aff'd*, 569 Fed.Appx. 494 (9th Cir. 2014) (rejecting the plaintiff's contention that his claim was not time-barred because the full extent of his injury had yet to be discovered); *see also Stanley v. Tr. of Cal. State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006) ("[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful") (citation and internal quotations omitted).

Defendants' civil rights claims are barred by the statute of limitations. As a result, the Court declines to address their merits and the City's evidentiary objection is denied as moot. *See Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F.Supp.2d 1065, 1088-89 (D. Or. 2012) (denying an evidentiary objection as moot where "the evidence moved against does not change the [court's] recommendation" regarding summary judgment). The Court nonetheless notes that evidence of intentional discrimination, amongst other things, is necessary to prevail on a claim under 42 U.S.C. § 1981, 42 U.S.C. § 1983, and 42 U.S.C. § 2000d. *See* Pl.'s Mot. Summ. J. 26-27 (doc. 116); Defs.' Resp. to Mot. Summ. J. 14-16 (doc. 121) (outlining to the applicable standard). The evidence defendants rely on – i.e., (1) "Deputy City Attorney Simon Whang's involvement in

---

121); *see also Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (where "the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court"); *McClellan v. I-Flow Corp.*, 2009 WL 3448871, *1 (D. Or. Oct. 22, 2009) (declining to consider the plaintiffs' "claims [on summary judgment] that are not yet pled").

this case" (including his May 2019 "racist 'joke'" at a Multnomah Bar Association event); (2) the fact that "[t]his is the only lawsuit [the City] has filed against an affordable housing owner for breaches of the owner's regulatory and loan agreements"; and (3) Portland's "longstanding history of racial housing and land use practices that created and reinforced racial segregation and inequities" – fails to meet this standard given the record before the Court. Defs.' Resp. to Mot. Summ. J. 16-19 (doc. 121).

## CONCLUSION

For the reasons stated herein, defendants' Partial Motion for Summary Judgment (doc. 111) is denied as to attorney fees and granted in all other respects. The City's Motion for Summary Judgment (doc. 116) is granted as to defendants' counterclaims and denied in all other respects. The parties' requests for oral argument are denied as unnecessary. This case is dismissed. Any motion as to prevailing party attorney fees under Or. Rev. Stat. § 20.077 in light of the resolution of the parties' summary judgment motions must be filed within 30 days of the date of this Opinion and Order.

IT IS SO ORDERED.

DATED this 7th day of June, 2022.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge